**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**GLORIA SAUERWEIN,**

Plaintiff,

v.

**CITY OF TOLEDO, et al.,**

Defendants.

CASE NO. 3:23 CV 1071

JUDGE JAMES R. KNEPP II

**MEMORANDUM OPINION AND ORDER**

## INTRODUCTION

Currently pending in this civil rights action are the parties' cross-motions for summary judgment. (Docs. 59, 60). Both are fully briefed and ripe for decision. *See* Docs. 64, 65, 66. Also pending is Plaintiff's Motion to Strike Exhibit B (Faulkner Opinion) from Defendant's' Memorandum in Opposition (Doc. 67), which Defendants oppose (Doc. 68). Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1367. For the reasons set forth below, the Court grants Defendants' Motion for Summary Judgment (Doc. 59) as to the federal claims asserted and declines to exercise supplemental jurisdiction over the state claims, denies Plaintiff's Motion for Summary Judgment (Doc. 60), and denies as moot Plaintiff's Motion to Strike (Doc. 67).

## BACKGROUND

On May 29, 2022, Toledo Police Officers Burton, Meier, Lawson, and Toledo Police Sergeant Jennings responded to a call reporting Plaintiff[1] was the victim of domestic violence. (Burton Depo., Doc. 45-3, at 29; Jennings Depo., Doc. 45-5, at 13; Lawson Depo., Doc. 45-2, at 7-8; Meier Depo., Doc. 45-4, at 148). Plaintiff's sister Diana Cindle called 911 reporting their

1. It is undisputed that Plaintiff's last name changed from Marksch to Sauerwein at some point; no one disputes that references to Gloria Marksch are references to Plaintiff. *See, e.g.*, Doc. 59-2.

father, Ken Marksch, received a call from Plaintiff stating Plaintiff's boyfriend, Timothy Tucker, was beating her. *See* Burton Depo., Doc. 45-3, at 31; Jennings Depo., Doc. 45-5, at 13; Lawson Depo., at 90-91; Meier Depo., Doc. 45-4, at 148).[2] The officers' response and incident at issue were captured on all officers' body-worn cameras. *See* Benninghoff Decl., Doc. 59-1 and body camera videos from Officers Lawson, Burton, Meier, and Jennings.[3]

Upon the officers' arrival on May 29, Cindle and her friend Chris Hendry were outside and repeated that they believed Plaintiff was being assaulted. (Lawson Video at 00:-0:15). They further reported Tucker possibly had weapons in the house. *Id.* at 0:15-0:33.

Lawson made the initial contact at the house, but Plaintiff refused to speak with her and did not open the door. (*Id.* at 0:33-1:43); Lawson Depo., Doc. 45-2, at 11. At some point while officers were outside the house, Officer Burton discovered a bench warrant had been issued for Plaintiff on a wrongful entrustment charge. (Lawson Depo., Doc. 45-2, at 14-15); (Burton Depo., Doc. 45-3, at 21).

Other officers arrived on the scene, including Officers Meier and Burton, as well as Lieutenant Jennings. Plaintiff eventually came out of the house about fifteen minutes after Lawson originally arrived. She believed that, if she could show them she was okay, she could go back inside. (Plaintiff Depo., Doc. 45-2, at 144, 146-47). While standing outside her house,

---

2. Plaintiff testified she had never told anyone in her family that she was the victim of domestic violence. (Plaintiff Depo., Doc. 45-1, at 42).

3. Four days prior to the incident at issue in this case, police had been at the same house investigating an incident where a neighbor reported someone was "going around in a car pointing a gun outside of his window driving around the neighborhood and then he ended up threatening one of the neighbors." (Burton Depo., Doc. 45-3, at 17). The car associated with that report was parked at Plaintiff's house. *Id.*; Plaintiff Depo., Doc. 45-1, 68-74; Jennings Body Camera Video from May 25, 2022; *see also* Lawson Video, at 5:48-:58 (describing information police had about this prior incident).

Plaintiff told the officers to leave. Officer Burton said, "you have warrants" as both Lawson and Burton reached for Plaintiff as she walked back toward her front door.

Lawson can be heard saying, "Ow, stop it," during the handcuffing process. (Lawson Video, at 16:40-:51). Lawson testified Plaintiff dug her nails into Lawson's hand during the struggle, which caused scratches that bled. (Lawson Depo., Doc. 45-2, at 40, 47). It is undisputed that during this handcuffing process, Plaintiff's left arm was broken. *See* Lawson Depo., Doc. 45-2, at 56 (defense counsel's statement that "[W]e'll stipulate that while she was being arrested, you know, due to the result of the officers' actions, her arm broke and it hurt . . . We've never disputed the fact that her arm broke during this arrest"); *see also, e.g.*, Jennings Video at 5:47-48. Almost immediately after the officers handcuff Plaintiff, Lawson calls for the Fire Department/EMTs. (Lawson Video, at 17:38-:39) ("Can we get Fire out here?); *see also* Lawson Depo., Doc. 45-2, at 55; Jennings Video, at 7:11 ("Can we have medical at our location?").

The body camera videos then depict the following. Plaintiff's sister approaches and comforts her, wrapping her arms around her upper body. *See generally* Lawson Video, at 17:05-27:51; Jennings Video, at 5:50-15:54.The videos depict Plaintiff crying, screaming, stating officers' broke her arm, describing that her arm hurts, asking for an ambulance, and asking Lawson to let go of her. Officer Lawson, who had escorted Plaintiff to the driveway, keeps a hand on Plaintiff's right arm for slightly less than three minutes, then says, "I'll leave you alone," and allows Cindle and Hendry to support and comfort Plaintiff. *See* Lawson Video, at 19:41-:51.

During this time and continuing throughout, Plaintiff can be heard screaming that officers broke her arm, stating she is in pain, and asking people (including her sister) not to move her arm or telling them how to position her arm to alleviate her pain. Plaintiff is intermittently but not

constantly screaming during this time. At times she is quiet or conversing in a level tone, and, at other times, she yells about Cindle or Hendry's positioning making her pain worse or moaning and screaming in apparent pain. Plaintiff's arms remain handcuffed behind her back during this time; the officers do not touch her after Lawson had let go. *See generally* Lawson Video, at 17:05-27:51; Jennings Video, at 5:50-15:54.

Approximately seven minutes after Plaintiff is handcuffed, officer radios can be heard with a dispatcher confirming "medical is en route." (Jennings Video, at 12:28-34). A fire truck arrives approximately ten minutes after Plaintiff is originally placed in handcuffs.

After the EMTs make initial contact with Plaintiff, Lawson ultimately removed Plaintiff's handcuffs for Toledo Fire EMTs; this is approximately twelve minutes after Plaintiff was initially handcuffed and her arm was broken. *See* Jennings Video, at 17:55-18:03; Lawson Video 29:19-:40. Once Lawson removes the handcuffs, Plaintiff continues yelling in pain as she moves her arm to the front of her body, but then her visible distress decreased. (Jennings Depo., Doc. 45-5, at 86-87).

While the EMTs were treating Plaintiff, Jennings can be heard discussing how to report the call and the incident, as well as potential charges. *See, e.g.*, Jennings Video, at 23:10-25:00.

Plaintiff's Expert, Dr. Kirk Davis, opined Plaintiff's break "was severe" and "would cause excruciating pain." (Davis Aff., Doc. 60-1, at 1). He further opined:

> Placing her in handcuffs behind her back put additional pressure on the break by twisting the arm behind her back. One can conclude with a reasonable degree of medical certainty that such placement of the hands behind her back in handcuffs upon a distal fracture of the humerous [sic] would dramatically increase the pain. It may also have displaced the fracture. I can opine with a reasonable degree of medical certainty that placing her in handcuffs behind her back did not help the injury and instead worsened it. . . . I opine that the cause of [Plaintiff's] injury resulted from the actions of Officer Burton that led to the left humerous [sic] fracture and that leaving her in cuffs for approximately ten minutes worsened her pain and that her injury has resulted in permanent damage to her arm.

*Id.* at 1-2.

The officers testified they kept Plaintiff handcuffed because she remained a potential threat in their eyes. Specifically, Officer Lawson testified officers did not uncuff Plaintiff because "[a]n injured person can still be combative," "we don't know at the time what she's capable of or whether or not she was still a threat to us at that time", and "[i]n the event that she is still combative after we remove the handcuffs would cause us to take further action which could be a harm to not only just us, potential harm, but for her as well, so we keep her in the handcuffs until the EMS arrives." (Lawson Depo., Doc. 45-2, at 72-74). Lawson believed Plaintiff was a potential threat because "of her prior actions," including her scratching of Lawson's hand during the struggle which Lawson described as "proof that she was physically combative." *Id.* at 74. Sergeant Jennings testified if they had removed Plaintiff's handcuffs, "[t]here was a possibility we would be right back to where we were when we didn't have control of her to place her into custody." (Jennings Depo., Doc. 45-5, at 57). Officer Meier explained:

> And if we take her out of handcuffs, there is a risk factor that she could start fighting again, so that's a harm to herself because then we have to place her back into custody that could result in more injuries which would be unintentional but that's what could happen. So for her safety too, it's best to keep her calm with her family so we can attempt to deescalate her until Fire gets there.

*Id.* at 143-44.

Ultimately, by the time EMTs arrived, Lawson testified the officers had enough time to "gauge whether or not she was still a physical threat" and because they determined she was not, they removed the handcuffs. (Lawson Depo., Doc. 45-2, at 75-76).

At the end of the officers' body camera videos, Jennings says, "[w]e'll meet over at Hawkins," referencing a nearby elementary school. *See* Jennings Depo., Doc. 45-5, at 110. He testified, however, that "[n]o one ended up actually making it to Hawkins" because the workday

was busy. *Id.* at 111. Instead, "later in the evening, [the officers] all were able to reconvene at Scott Park at the actual police station." *Id.*

The Officers all completed "Response to Resistance" reports. *See* Plaintiff Ex. 23. Jennings Report originally stated, "Burton used a joint manipulation on the suspect's left arm, at the same time the suspect pulled away from the officer[] causing injury to her left arm." *Id.* at 17. In his deposition, he conceded this was not entirely accurate. (Jennings Depo., Doc. 45-5, at 98-99).

Although she originally did not see any point in filing charges despite Burton or Jennings suggesting she do so, Officer Lawson ultimately changed her mind and pressed charges against Plaintiff for the scratches to her hand. (Lawson Depo., Doc. 45-2, at 67-68, 144-45). On September 26, 2022, a Lucas County Common Pleas Court grand jury indicted Plaintiff on charges of assault of a peace officer in violation of Ohio Revised Code § 2903.13(A) and (C)(5) (a fourth-degree felony), and resisting arrest in violation of Ohio Revised Code § 2921.33(B) and (D) (a first degree-misdemeanor). (Doc. 59-2).

On February 7, 2023, pursuant to a plea agreement, Plaintiff entered a plea of no contest to the resisting arrest charge in exchange for the State agreeing to dismiss the assault charge at sentencing. (Doc. 59-3, at 1). The Judge accepted the plea agreement and found Plaintiff guilty. *Id.* at 2.

On July 2, 2025,[4] Plaintiff obtained a sealing/expungement of the record of this conviction pursuant to Ohio Revised Code § 2953.32. (Doc. 54-3) (trial court expungement judgment entry). The State of Ohio moved for relief from that judgment and the trial court

4. This was almost two months after Defendants in this case filed an original motion for summary judgment arguing, in part, that some of Plaintiff's claims were barred by her no contest plea. (Doc. 46).

granted the State's motion, vacating the earlier order of expungement on November 19, 2025. (Doc. 59-5). Plaintiff appealed that decision to the Ohio Sixth District Court of Appeals, which affirmed on June 18, 2026. *State v. Marksch*, 2026 WL 1766016 (Ohio Ct. App.).

## STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257; *see also* Fed. R. Civ. P. 56(c)(1). Further, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials").

## DISCUSSION

Both Plaintiff and Defendants move for summary judgment in their favor. Upon review, and for the reasons set forth below, the Court finds Defendants are entitled to summary judgment on Plaintiff's federal claims and declines to exercise supplemental jurisdiction over Plaintiff's state law claims.

Use of Force to Effectuate Arrest

Defendants first contend they are entitled to summary judgment on Count 1 of Plaintiff's Complaint which alleges Officer Burton used excessive force when arresting Plaintiff. (Doc. 59, at 19-27). They assert such a claim is barred by the *Heck v. Humphrey* doctrine and, even if it is not, Plaintiff cannot establish the force was excessive or violated a clearly established right. *Id.* In opposition and in her own motion seeking summary judgment, Plaintiff resists both arguments. For the reasons set forth below, the Court agrees with Defendants that Plaintiff's excessive force claim pertaining to the force used prior to her arrest is *Heck*-barred.

Under the doctrine set forth in *Heck v. Humphrey*, a § 1983 action cannot "necessarily imply the invalidity of [a plaintiff's] conviction or sentence." 512 U.S. 477, 487 (1994). That is, when a litigant brings a lawsuit that "would necessarily imply the invalidity of" the underlying conviction, *Heck* bars the lawsuit unless the plaintiff "can demonstrate that the conviction or sentence has already been invalidated." *Heck*, 512 U.S. at 487. The plaintiff must show "that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.*

*Heck* preclusion thus can arise when a plaintiff is convicted of a crime and does not raise excessive force as an affirmative defense during their criminal proceedings despite having the

opportunity to do so. *Parvin v. Campbell*, 641 F. App'x 446, 449 (6th Cir. 2016); *see also Cummings v. City of Akron*, 418 F. 3d 676, 682-83 (6th Cir. 2005) (finding *Heck* bar applicable where the "struggle between [the plaintiff] and the officers gave rise to both [the plaintiff's] assault conviction and the excessive force claim, and the two [were] inextricably intertwined"). If such plaintiff claims excessive force was used against her before *and* after she was brought under control, *Heck* will bar the pre-control claim and permit the post-control claim. *Matheney v. City of Cookeville*, 461 F. App'x 427, 431 (6th Cir. 2012) ("[A]n excessive force claim is not barred when the alleged use of force occurred *after* the suspect was handcuffed and brought under control."); *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 611 (6th Cir. 2014) ("*Heck* does not bar § 1983 suits alleging *post-arrest* excessive force."). This is because an allegation of excessive force arising after the individual is under control "would not be 'inextricably intertwined' with the suspect's resistance to arrest." *Matheney*, 461 F. App'x at 431.

Plaintiff was convicted of resisting arrest based on the at-issue incident. (Doc. 59-3).[5] Specifically, she pled guilty to resisting arrest in violation of Ohio Revised Code § 2921.33(B) and (D). These provisions provide:

> (B) No person, recklessly or by force, shall resist or interfere with a lawful arrest of the person or another person and, during the course of or as a result of the resistance or interference, cause physical harm to a law enforcement officer.

* * *

5. Contrary to Plaintiff's argument, *see* Doc. 65, at 15, the fact that she pled no contest to the resisting arrest charge does not change the analysis. *See Cummings*, 418 F.3d at 684 (concluding *Heck* barred plaintiff's Fourth Amendment excessive force claim based on plaintiff's plea of no contest to assaulting the officer). Plaintiff additionally argues that the law should be different than *Heck* dictates. (Doc. 65, at 20-21). But Plaintiff's arguments about what the law *should be* cannot overcome what the law *is*. *See Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) ("'If a precedent of this Court has direct application in a case' . . . , a lower court 'should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.'") (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989)).

> (D) Whoever violates this section is guilty of resisting arrest. A violation of division (A) of this section is a misdemeanor of the second degree. A violation of division (B) of this section is a misdemeanor of the first degree. A violation of division (C) of this section is a felony of the fourth degree.

Ohio Rev. Code § 2921.33(B)-(D).

Ohio law permits an affirmative defense of excessive force to a resisting arrest charge, and therefore "a § 1983 claim of excessive force would necessarily imply the invalidity of an underlying conviction for resisting arrest" in Ohio. *Hayward*, 759 F.3d at 611. Accordingly, Defendants are correct to note Plaintiff's conviction for resisting arrest bars her excessive force claim to the extent the challenged force was applied during the course of the resistance which underlies her conviction.[6]

Here, Plaintiff's arm was broken prior to her being handcuffed and brought under control. And it happened as part of the same struggle wherein Plaintiff scratched Officer Lawson. Plaintiff was convicted of resisting arrest, including an element of causing physical harm to a law enforcement officer. *See* Doc. 59-2; Ohio Rev. Code § 2921.33(B) (requiring "as a result of the resistance or interference" the defendant "cause[d] physical harm to a law enforcement officer.").

As such, the Court finds Defendants are entitled to summary judgment on Count I of Plaintiff's Complaint.[7]

---

6. As noted above, although Plaintiff originally obtained a sealing/expungement of her resisting arrest conviction (Doc. 54-3), that decision was vacated (Doc. 59-5), and the decision to vacate was affirmed, *Marksch*, 2026 WL 1766016. Thus, under the current legal landscape, Plaintiff cannot demonstrate her conviction "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck*, 512 U.S. at 487. The Court thus need not and does not offer any opinion on Defendants' alternative argument that the expungement Plaintiff originally obtained "is not the type of invalidation of conviction required to proceed under *Heck*." *See* Doc. 59, at 20-25.

7. As such, any allegation of failure to intervene in the use of this pre-arrest force (as asserted in Count Three of the Amended Complaint) is also *Heck*-barred. Moreover, as Defendants correctly

Post-Arrest Use of Force

Plaintiff also contends officers used excessive force after she was arrested. In Count II, Plaintiff contends Burton, Lawson, Meier, and Jennings used excessive force "by leaving Plaintiff in handcuffs that painfully twisted her broken arm behind her back for more than 10 minutes." (Doc. 18, at 10). In Count III, Plaintiff further asserts a failure-to-intervene claim against the same officers for failure to remove the handcuffs during this period. *Id.* at 11-14. As noted above, "an excessive force claim is not barred [by *Heck*] when the alleged use of force occurred *after* the suspect was handcuffed and brought under control." *Matheney*, 461 F. App'x at 431. Thus, although Plaintiff's contentions regarding the use of force in effectuating her arrest (including the act of handcuffing her itself) are barred by *Heck*, any use of force subsequent thereto is not.

The Officer Defendants assert entitlement to qualified immunity on these Counts. *See* Doc. 59 at 18-19, 27-29; Doc. 64, at 18-20. Qualified immunity "spares officers from 'the time, expense and risk of money-damages actions' unless they violate clearly established constitutional rights." *Moore v. Oakland Cnty.*, 126 F.4th 1163, 1167 (6th Cir. 2025) (quoting *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 508 (6th Cir. 2012)). Unlike other affirmative defenses, a plaintiff bears the burden of overcoming qualified immunity once any defendant raises it. *See Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021). To do so, a plaintiff must demonstrate: (1) the officers violated the plaintiff's constitutional right; and (2) the violated right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Court retains the

---

note in Reply: "If Plaintiff is now arguing Counts Two and Three also relate to the actual placement of handcuffs on Plaintiff" in the first instance, "such a claim would be barred by *Heck*" because "[t]he placement of handcuffs occurred at the same time [as] the arm was broken, and is intertwined with Plaintiff's arrest and Plaintiff's resistance of that arrest." (Doc. 66, at 8).

discretion to address each element in either order. *Pearson v. Callahan*, 555 U.S. 223, 236, (2009).

"In identifying clearly established rights, the Supreme Court warns lower courts against defining them 'at a high level of generality.'" *Moore*, 126 F.4th at 1167 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). For all but the most obvious of constitutional violations, the plaintiff must "identify another case that places the constitutional question beyond debate." *Lee v. Russ*, 33 F.4th 860, 863 (6th Cir. 2022). While the facts of the identified case need not be identical to the case at hand, they must be meaningfully similar such that it would "bind a panel of [the Sixth Circuit]." *Bell v. City of Southfield*, 37 F.4th 362, 368 (6th Cir. 2022). The material facts of the cited case "must be similar enough that [it] 'squarely governs'" the one before the Court. *Studdard v. Shelby Cnty.*, 934 F.3d 478, 481 (6th Cir. 2019) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). If the law is not sufficiently clear such that a reasonable officer would be on notice that his conduct is clearly unlawful, qualified immunity is appropriate. *Id.* at 202.

Defendants contend no clearly established caselaw would have informed a reasonable officer at the scene that leaving Plaintiff in handcuffs after she resisted arrest and while awaiting a medical response was unconstitutional. The Court agrees.

It is true that "[t]he Fourth Amendment prohibits unduly tight or excessively forceful handcuffing during the course of a seizure." *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009). And, "freedom from excessively forceful handcuffing is a clearly

established right under the Fourth Amendment." *Baynes v. Cleland*, 799 F.3d 600, 617 (6th Cir. 2015).

Again, due to the *Heck* bar, Plaintiff cannot argue the initial placement of the handcuffs violated her rights. Thus, her remaining contention in Counts II and III (and as she argues in her opposition brief) is that her handcuffs should have been removed entirely (or, she at least implies, moved to the front of her body). *See* Docs. 18, at 10 ("The handcuffs were completely unnecessary. Plaintiff needed immediate medical attention; not detention."); *id.* at 12 ("The handcuffs, as an instrumentality of the defendants, could have been removed by any of the defendants at any time[.]"); Doc. 60, at 10 ("Defendants had a duty to intervene to alleviate [Plaintiff's] excruciating pain and prevent the injury from worsening by removing the handcuffs.") (internal citations omitted); Doc. 60, at 9-10 ("The *use* of the handcuffs was harmful and excessive especially when . . . they were unnecessary.") (emphasis added); Doc. 65, at 13 (describing "[t]he second instance of excessive force" as "leaving [Plaintiff] in [hand]cuffs").

The only case Plaintiff relies upon in opposition is *Lyons v. City of Xenia*, 417 F.3d 565 (6th Cir. 2005). *Lyons* acknowledged the general principle that it is clearly established that the Fourth Amendment prohibits unduly tight handcuffing. *Id.* at 575. It explained, "[n]ot all allegations of tight handcuffing, however, amount to excessive force. In order to reach a jury on this claim, the plaintiff must allege some physical injury from the handcuffing and must show that officers ignored plaintiff's complaints that the handcuffs were too tight.") (internal citations omitted).

But nothing in *Lyons* would inform a reasonable officer that he or she would be required to *remove* handcuffs from an individual who just moments prior resisted arrest (a fact Plaintiff

cannot dispute due to her no contest plea), particularly after officers had promptly requested a medical response. Nor would it inform a reasonable officer that they were required to unhandcuff and re-handcuff her in the front. As Defendants point out, Plaintiff "alleges her discomfort arose from the handcuffs being left on at all (as opposed to being placed too tightly)." (Doc. 59, at 29).

An officer ignores an arrestee's complaints when he outright refuses to respond to them, disregards them, or dismisses them in a way that is effectively non-responsive. *Baynes v. Cleland*, 799 F.3d at 614); *see also Morrison*, 583 F.3d at 402 (holding the second prong of a tight handcuffing claim satisfied when officer denied the plaintiff's request to loosen the handcuffs and stated he could place handcuffs on "as tight as he wanted to and that's how they were staying"). But a delayed response alone does not amount to ignoring a complaint even in the tight handcuffing context. *See Miller v. Sanilac Cnty.*, 606 F.3d 240, 252, n.8 (6th Cir. 2010) (noting officers indeed do not "ignore" complaints when they immediately loosen or remove handcuffs but, nonetheless, "it can hardly be construed to mean that a longer response is automatically a violation"); *Rudolph v. Babinec*, 939 F.3d 742, 751 (6th Cir. 2019) ("Conduct, not time, is the measurement of a violation."). "Moreover, police have 'additional leeway' in responding to a detainee's complaints when the detainee resisted arrest or threatened the officer." *Ennes v. Presque Isle Cnty.*, 2026 WL 559860, at *4 (6th Cir.) (quoting *Getz v. Swoap*, 833 F.3d 646, 655 (6th Cir. 2016)).

The officers here knew Plaintiff had suffered some sort of injury to her arm in the course of being placed in handcuffs in response. However, just prior to the handcuffs being placed on her, Plaintiff resisted arrest and remained at least somewhat combative by yelling or arguing with the officers about why they were at her house. The officers promptly requested the Toledo Fire Department respond to provide medical attention after placing Plaintiff in handcuffs. Although

Plaintiff's expert opines that placement of Plaintiff's hands behind her back caused additional pain, *Heck* prevents Plaintiff from challenging the arrest and initial process of the handcuffing. *See* Davis Aff., Doc. 60-1, at 1 ("*Placing* her in handcuffs behind her back put additional pressure on the break . . . such *placement* of the hands . . . would dramatically increase the pain . . . [and] may also have displaced the fracture."). And Plaintiff identifies no case law suggesting the officers should have known they were required to respond differently *after* Plaintiff was handcuffed.[8] Indeed, Officers Lawson and Meier testified that, in addition to the concern that Plaintiff had recently been combative, there was concern that removing the cuffs could result in further injury to Plaintiff herself. *See* Lawson Depo., Doc. 45-2, at 72-74; Meier Depo. Doc. 45-4, at 143-44. The Court finds Plaintiff has not identified any case clearly establishing the officers were required to remove Plaintiff's handcuffs during the ten to twelve minutes while they awaited medical assistance.

Because Plaintiff has not pointed to clearly established law that would have informed Defendants their actions were unlawful, the Court finds Defendants are entitled to qualified immunity on Plaintiff's excessive force claim related to being left in handcuffs for ten to twelve minutes after her injury (Counts 2) and her related failure-to-intervene claim (Count 3).[9]

---

8. Plaintiff argues police training "requires cuffing in front for injured parties." (Doc. 65, at 13). But again (1) Plaintiff cannot challenge the initial handcuffing, and (2) the training Plaintiff cites (from the Ohio Peace Officer Basic Training manual from 2012) is not applicable to her circumstances. It states:

I. Special circumstances.
 1. Handcuffing subjects with medical issues
  a. Missing limbs – use belly chain and/or belt
  b. Women that are pregnant – recommend handcuffing in front.

(Plaintiff Ex. 41, at 36).

9. In her opposition brief, Plaintiff appears to bring a supervisory liability claim against Jennings for the first time, stating conclusorily that "Jennings supervised the officer who used the excessive force and is liable therefor." (Doc. 65, at 14). But, as Defendants point out, "[t]his claim is not pled" in the Complaint. (Doc. 66, at 14). Moreover, to the extent Plaintiff directs this

Malicious Prosecution

Defendants further contend they are entitled to summary judgment on Plaintiff's claim for malicious prosecution in Count IV. (Doc. 59, at 29-31). In Count IV, Plaintiff alleges she was maliciously prosecuted for felonious assault. (Doc. 18, at 14-15). The Court agrees with Defendants.

The Fourth Amendment prohibits malicious prosecution. *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir.2010). To succeed on a malicious prosecution claim under § 1983, a plaintiff must prove: (1) the defendant made, influenced, or participated in the decision to prosecute the plaintiff; (2) there was no probable cause for the criminal prosecution; (3) as a consequence of the legal proceedings, the plaintiff suffered a deprivation of liberty apart from the initial arrest; and (4) the criminal proceeding was resolved in the plaintiff's favor. *Id.* at 308–09.

Defendants challenge Plaintiff's ability to satisfy the second or fourth element of such a claim. *See* Doc. 59, at 30-31. Plaintiff responds that the indictment is false on its face and that she "can presume . . . that defendants falsely claimed to the grand jury . . . that Gloria caused her own injury." (Doc. 65, at 22). This is so, she contends, because:

> [U]nder their argument for dismissal under *Heck*, the Defendants state that the police brutality of Burton would have been a complete defense to resisting arrest. They cannot have it both ways (if Burton's brutality is a complete defense to resisting arrest is true as argued by Defendants under *Heck*, then [Plaintiff] should never have been charged because the state would have known of said defense and charged her anyway.

---

supervisory liability contention at the use of force to effectuate Plaintiff's arrest, such a claim is barred by *Heck*. To the extent Plaintiff directs this claim at any post-arrest use of force, she has not identified evidence to establish such supervisory liability. *See Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016) ("A supervisory official's failure to supervise, control or train the offending individual is not actionable *unless* the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it. We have interpreted this standard to mean that at a minimum, the plaintiff must show that the defendant at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.") (citation modified).

(Doc. 65, at 21-22). The problem with this argument is that it conflates the *Heck* analysis – which is concerned with implying the invalidity of convictions – with whether there was probable cause for a charge (even if there may have been a defense thereto). The Court finds Defendants have established their entitlement to summary judgment on this claim.

"Subject to one exception, a valid grand jury indictment 'conclusively determines the existence of probable cause.'" *Martin v. Maurer*, 581 F. App'x 509, 511 (6th Cir. 2014) (quoting *Robertson v. Lucas*, 753 F.3d 606, 616 (6th Cir. 2014)). "The exception applies when the defendants knowingly present false testimony to the grand jury." *Id.*

A grand jury indicted Plaintiff on, *inter alia*, a charge of assault in violation of Ohio Revised Code § 2903.13(A) and (C)(5), a fourth-degree felony. (Doc. 59-2). Plaintiff has presented no evidence other than her own speculation that any Defendant "knowingly presented false testimony to the grand jury." *Martin*, 581 F. App'x at 511.

Moreover, Plaintiff cannot establish the fourth element of a malicious prosecution claim requiring that the criminal proceeding was resolved in her favor. Dismissals other than those rendered on the merits are not considered to be resolutions in the plaintiff's favor. *See, e.g.*, *Nouri v. Cty. of Oakland*, 615 F. App'x 291, 300 (6th Cir. 2015) (noting convictions dismissed as a part of a plea deal were not resolutions in plaintiff's favor); *Thornton v. City of Columbus*, 171 F. Supp. 3d 702, 710 (S.D. Ohio 2016) (finding that a hung jury on some charges, which were later dropped, insufficient to demonstrate resolution in the plaintiff's favor) (citing *Singleton v. City of New York*, 632 F.2d 185, 193 (2d Cir. 1980)). Here, the prosecutor agreed to *nolle* the assault charge at sentencing as part of a plea agreement wherein Plaintiff pled no contest to the resisting arrest charge. *See* Doc. 59-3, at 1. This is not favorable termination. *See Posr v. Ct. Officer Shield # 207,* 180 F.3d 409, 418 (2d Cir. 1999) ("If the outcome was the result of a compromise

to which the accused agreed . . . it is not a termination in favor of the accused for purposes of a malicious prosecution claim.") (citation modified); *see also Wims v. New York City Police Dep't*, 2011 WL 2946369, at *3 (S.D.N.Y.) ("[The] plaintiff's guilty plea for [one charge] in satisfaction of all charges is not a favorable termination on the charge dismissed as part of the plea deal.").[10]

Finally, the Court agrees with Defendants that the exception would swallow the rule if, as Plaintiff contends, the completion of one's sentence satisfied the "favorable termination" element. Plaintiff cites no caselaw in support of such an argument and the Court rejects it.

Accordingly, Defendants' Motion is granted as to the malicious prosecution claim (Count IV).

<u>Civil Conspiracy</u>

In Count V, Plaintiff asserts "Conspiracy to Cover Up Police Brutality in Violation of a Civil Right." (Doc. 18, at 17). Therein, she asserts Burton, Meier, Lawson and Jennings "developed a single plan to cover up the brutality through lying about how the injury occurred, claiming assault upon Officer Lawson, and drumming up charges to intimidate and compromise Plaintiff." *Id.*

"A civil conspiracy under § 1983 is 'an agreement between two or more persons to injure another by unlawful action.'" *Bazzi v. City of Dearborn,* 658 F.3d 598, 602 (6th Cir. 2011) (quoting *Revis v. Meldrum,* 489 F.3d 273, 290 (6th Cir. 2007)). It requires "a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was

---

10. Defendants are entitled to summary judgment on Plaintiff's malicious prosecution claim for this reason whether it is brought under federal law, state law, or both. "A malicious prosecution claim, whether under federal or Ohio law, requires a favorable termination of the underlying criminal case against the plaintiff." *Klosterman v. Konza, LLC*, 2026 WL 91738, at *1 (S.D. Ohio) (first citing *Susselman v. Washtenaw Cnty. Sheriff's Off.*, 109 F.4th 864. 870 (6th Cir. 2024); and then citing *Criss v. Springfield Twp.*, 564 N.E.2d 440, 443 (Ohio 1990)).

committed in furtherance of the conspiracy that caused injury to the complainant." *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985).

Defendants first contend they are entitled to summary judgment because Plaintiff has established no injurious constitutional violation. A plaintiff "cannot succeed on a conspiracy claim because there was no underlying constitutional violation that injured her." *Wiley v. Oberlin Police Dep't*, 330 F. App'x 524, 530 (6th Cir. 2009); *see also Song v. Parker*, 2023 WL 7103180, at *5 (6th Cir.) ("[B]ecause Song's underlying constitutional claims failed, his conspiracy claim also failed."). Moreover, they contend that even if there is a question of fact regarding a constitutional violation and even assuming *arguendo* the officers' reports contained intentional misstatements, they are still entitled to summary judgment.

"The mere fact that police officers conspired to prepare and file a false report is not actionable under § 1983 unless some action is taken on the report which violates the plaintiff's constitutional rights, or results in the denial of the plaintiff's access to the courts." *Pineda v. Hamilton Cnty.*, 2016 WL 950362, at *4 (S.D. Ohio) (internal citation omitted) (first citing *Landrigan v. City of Warwick*, 628 F.2d 736, 744-45 (1st Cir. 1980); then citing *Swekel v. City of River Rouge*, 119 F.3d 1259, 1261-64 (6th Cir. 1997); and then citing *Gibson v. City of Chicago*, 910 F.2d 1510, 1523-24 (7th Cir. 1990)).

The only constitutional violation Plaintiff alleges as a result of the allegedly false reports and "cover up" is the alleged malicious prosecution for assault on Officer Lawson. But there is no factual dispute regarding whether Plaintiff scratched Officer Lawson. *See* Lawson Depo., Doc. 45-2, at 40, 42; *see also* Plaintiff's Depo., Doc. 45-1, at 92 (stating only that Plaintiff did not recall doing so); *Farris v. Oakland Cnty.*, 96 F.4th 956, 966 (6th Cir. 2024) (holding that "this type of 'memory lapse[]'", such as being unable to recall, "cannot create a jury question on

the issue") (quoting *Boykin v. Fam. Dollar Stores of Mich., LLC*, 3 F.4th 832, 839 (6th Cir. 2021)). And, perhaps more importantly, Plaintiff pled no contest to resisting arrest, an element of which was causing physical harm to a law enforcement officer. *see also* Doc. 59-3 (Plaintiff's conviction for resisting arrest, including an element of causing physical harm to a law enforcement officer under Ohio Rev. Code § 2921.33(B)).

In her opposition brief, Plaintiff contends the officers conspired to "cover up Burton's excessive force with a false narrative of Gloria causing her own injury." (Doc. 65, at 22). But even if true, Plaintiff fails to show how this attempted "cover up" violated her constitutional rights. She could have raised the excessive force argument in response to her prosecution. She did not. Instead, she pled no contest to a resisting charge that included injury to a police officer as an element. *See* Doc. 59-3, at 1. Put simply, she cannot now argue that the officers brought baseless charges to which she pled no contest.

Moreover, although Plaintiff conclusorily alleges in opposition that the officers' actions "deprived, or attempted to deprive" her of "access to the courts," she provides no clear explanation for how this is so, nor does she cite any caselaw or evidence in support of this assertion.

The Court therefore finds Defendants have established their entitlement to summary judgment on Count Five – Civil Conspiracy.

*Monell* Claims

In Count Six, Plaintiff brings a *Monell* claim against the City of Toledo based on (1) a failure to discipline Officer Burton for the use of force; (2) a failure to supervise; and (3) a failure to train. *See* Doc. 18, at 25. Defendants contend they are entitled to summary judgment on claims because she has not established a custom or practice of the City's caused her any

constitutional injury.[11] (Doc. 64, at 21-24). Plaintiff responds that her claims survive because the facts demonstrate inadequate training on domestic violence, use of force, proper arrest protocol, or assisting an arrestee in medical distress as well as a failure to investigate and discipline. (Doc. 65, at 23-24).

A municipality sued under § 1983 is liable for damages only if the injury occurs pursuant to a municipal custom or policy. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). In other words, the doctrine of *respondeat superior* does not apply to municipalities in § 1983 actions. *Id.* at 691. To succeed on a § 1983 claim based on a municipal policy or custom, Plaintiffs must "identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993). A plaintiff generally has four ways to demonstrate an unlawful policy or custom: "[t]he plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009) (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)). "To prevail on [a] § 1983 *Monell* claim[ ] against [a municipality] under the Fourth and Fourteenth Amendments, the plaintiffs must show (1) that they suffered a constitutional violation and (2) that a municipal policy or custom directly caused the violation." *Hardrick v. City of Detroit*, 876 F.3d 238, 243 (6th Cir. 2017) (citing *Monell*, 436 U.S. at 690-92). That is, "beyond having to identify 'conduct properly attributable to the municipality' itself, a plaintiff 'must also demonstrate that, through

11. Defendants further argue – correctly – that the § 1983 claims raised in Counts One through Five against the City must be dismissed because the City cannot be held liable on a theory of vicarious liability. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged.'" *Cherrington v. Skeeter,* 344 F.3d 631, 645 (6th Cir. 2003) (quoting *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997)).

At the outset, "[g]iven that '*Monell* claims allow for municipal liability for the constitutional violations of their employees only where the municipality's policy or custom led to the violation,' 'there can be no liability under *Monell* without an underlying constitutional violation.'" *Codrington v. Dolak*, 142 F.4th 884, 896 (6th Cir. 2025) (quoting *Chambers v. Sanders*, 63 F.4th 1092, 1101-02 (6th Cir. 2023)). In other words, a *Monell* claim "rise[s] and fall[s] with the success" of the underlying § 1983 claim. *Id.* So, because the Court has already determined that Plaintiff's § 1983 claim is *Heck*-barred in part, that same conclusion extends to the *Monell* claim. *See Lee v. United States*, 2022 WL 17076779, at *2-3 (6th Cir.) (affirming dismissal of plaintiff's claims, including his *Monell* claim against the City of Detroit, on the ground that they were *Heck*-barred); *Shero v. Williams*, 2025 WL 1416771, at *4 (E.D. Pa.) (collecting cases for the proposition that *Heck* bars municipal-liability claims based on underlying *Heck*-barred conduct). Thus, any part of Plaintiff's *Monell* claim based on the pre-arrest use of force is *Heck*-barred.

The Court is therefore left with Plaintiff's *Monell* claims as they relate to the post-arrest use of force.

*Failure to Investigate / Discipline*

Plaintiff argues the City did not properly investigate the incident at issue here and "failed to discipline the officers in any way." (Doc. 60, at 13). To sustain a "failure to discipline" claim, Plaintiff must show that the City's failure to discipline constituted "deliberate indifference to the rights of its citizens, which failure *proximately caused* [the constitutional violation]." *Berry v.*

*City of Detroit,* 25 F.3d 1342, 1354 (6th Cir. 1994) (emphasis added). This requires a "history of widespread abuse that has been ignored by the City." *Id.* (citing *City of Canton,* 489 U.S. at 397); *see also Kowolonek v. Moore*, 2010 WL 1253140, at *8 (E.D. Ky.) ("While plaintiff argues . . . the City's failure to discipline the officers after this incident, such failure could have caused plaintiff no cognizable constitutional injury.") (quoting *Slusher v. Carson*, 540 F.3d 449, 456, 457 (6th Cir. 2008)(, *aff'd*, 463 F. App'x 531 (6th Cir. 2012)

A claim based on a failure to investigate or discipline "requires 'not only an inadequate investigation in this instance,' but also 'a clear and persistent pattern of violations' in earlier instances." *Pineda*, 977 F.3d at495 (quoting *David v. City of Bellevue*, 706 F. App'x 847, 853 (6th Cir. 2017)).

The failure to *subsequently* discipline officers for their actions in this particular incident (upon which Plaintiff bases her claim) cannot be the "moving force" behind or proximate cause of any alleged constitutional violation. *See, e.g.*, *Murphy v. McKnight*, 2026 WL 835886, at *9 (S.D. Ohio) ("[A] single, after the fact, failure to discipline [the officer defendant] for this incident could not have *caused* [the plaintiff's] alleged injuries."). Thus, the Court finds Defendants are entitled to summary judgment on Plaintiff's failure to discipline *Monell* claim.[12]

*Failure to Train / Failure to Supervise*

"To succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d

12. Having found Defendants entitled to summary judgment on Plaintiff's federal claims without reference to defense expert Samuel Faulker's expert report, the Court denies Plaintiff's Motion to Strike that report (Doc. 67) as moot.

690, 700 (6th Cir. 2006). In other words, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388. "To establish deliberate indifference, the plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the [City] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" *Miller*, 606 F.3d at 255 (6th Cir. 2010) (quoting *Fisher v. Harden,* 398 F.3d 837, 849 (6th Cir. 2005)).

Ultimately, as to any failure to train or supervise claim (whether for pre-arrest or post-arrest use of force), Plaintiff has not shown prior instances of unconstitutional conduct that would put the City on notice that its "training in this particular area was deficient and likely to cause injury." *Id.*[13] Dr. Scott's testimony that the officers were inadequately trained (*see* Doc. 60-2, at 35-36) does not change this result. Thus, the Court finds the City entitled to summary judgment on Plaintiff's failure to train or supervise claim.

---

13. Nor has Plaintiff presented any argument regarding "single incident" liability. In *City of Canton*, the Supreme Court explained a single violation may support *Monell* liability if "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." 489 U.S. at 390. By way of example, the Court noted that the need to train officers on using deadly force against fleeing suspects was "so obvious" that failure to do so could constitute deliberate indifference. *Id.* at 390 n.10. In *Brown*, the Supreme Court clarified that "single incident" liability depends on "[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle the situation will violate citizens' rights." 520 U.S. at 409. This is a rare exception applied only in "a narrow range of circumstances." *Id.*. Two elements are required: "It must be obvious that the failure to train will lead to certain conduct, *and* it must be obvious . . . that the conduct will violate constitutional rights." *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 995 (6th Cir. 2017). Plaintiff has not established these elements here.

State Law Claims

Plaintiff additionally brings state-law claims for "Willful and Wanton conduct" (Count Seven), "Gross Negligence and or Willful and Wanton Misconduct and or Assault and Battery" (Count Eight), "State Claims of Negligent Training, Discipline and Retention" (Count Nine), and "Res Ipsa Loquitur" (Count Ten). *See* Doc. 18, at 27-32.

District courts have discretion to refuse to exercise supplemental jurisdiction over state law claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims or remanding them to state court if the action was removed." *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996). The Court finds the balance of considerations weighs against the exercise of supplemental jurisdiction over Plaintiff's state law claims. The claims are therefore dismissed without prejudice. *Bullock v. City of Covington*, 698 F. App'x 305, 307 (6th Cir. 2017) ("Normally, when a court declines to exercise supplemental jurisdiction, the court dismisses the [state] claims without prejudice.") (citations omitted).

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Defendants' Motion for Summary Judgment (Doc. 59) be, and the same hereby is, GRANTED in part as to Plaintiff's Federal claims and DENIED in part as to Plaintiff's state law claims, which are hereby DISMISSED WITHOUT PREJUDICE, and it is

FURTHER ORDERED that Plaintiff's Motion for Summary Judgment (Doc. 60), be and the same hereby is, DENIED; and it is

FURTHER ORDERED that Plaintiff's Motion to Strike (Doc. 67), be and the same hereby is, DENIED AS MOOT.

s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

Dated: September 21, 2026